# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PERRY BROWN,

      Plaintiff,

v.                            Case No.  3:19-cv-997-BJD-MCR

THE FLORIDA DEPARTMENT
OF CORRECTIONS, CORIZON,
LLC, and CENTURION OF
FLORIDA, LLC,

      Defendants.

_____

## **ORDER**

### I. Status

Plaintiff, Perry Brown, an inmate in the custody of the Florida Department of Corrections, initiated this action by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. He is proceeding on an Amended Complaint (Doc. 14; AC).[1] As Defendants, Plaintiff sues the Florida Department of Corrections (FDOC); Corizon, LLC (Corizon); and Centurion of Florida, LLC (Centurion). AC at 2-3. Plaintiff, who alleges he suffers from

---

[1] After Plaintiff initiated this action, the Court appointed counsel to represent Plaintiff. See Doc. 8. Plaintiff, with help from court appointed counsel filed the Amended Complaint. The Court then granted counsel's motion to withdraw and deemed Plaintiff to be proceeding pro se. See Doc. 60.

Hepatitis C virus (HCV), argues that Defendants Corizon and Centurion violated his Eighth Amendment right to be free from cruel and unusual punishment and that Defendant FDOC violated Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA) when Defendants, under a cost-saving policy, refused to provide Plaintiff with direct-acting antivirals (DAAs), a lifesaving HCV treatment. Id. at 15-20.

Before the Court is (1) Centurion's Motion for Summary Judgment (Doc. 68; Centurion Motion) with exhibits (Docs. 68-1; 68-2); (2) FDOC's Motion for Summary Judgment (Doc. 69; FDOC Motion) with exhibits (Doc. 69-1); and (3) Corizon's Motion for Summary Judgment (Doc. 71; Corizon Motion) with exhibits (Doc. 70-1). The Court advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and allowed him to respond to the Motions. See Order of Special Appointment (Doc. 15). Plaintiff filed a Response (Doc. 72)[2] to Defendants' Motions and Corizon replied (Doc. 73; Corizon Reply). These Motions are ripe for review.

---

[2] Plaintiff filed no evidence nor affidavits to support his Amended Complaint or Response.

## II. Plaintiff's Allegations

Plaintiff alleges that he entered FDOC custody on November 27, 2006. AC at 7. He contends that when he entered FDOC custody, he suffered from chronic HCV, a blood-borne disease. Id. at 3-7. He maintains that chronic HCV is a serious medical need, causing liver inflammation, liver scarring or fibrosis, cirrhosis, and possible death. Id. at 3. Plaintiff argues that he underwent a physical exam in 2011, during which FDOC physicians informed Plaintiff that his HCV infection had caused decompensated cirrhosis. Id. at 7. According to Plaintiff, he underwent further medical tests in November 2012, September 2013, August 2014, February 2015, May 2016, and July 2016, all of which confirmed that his decompensated cirrhosis had increasingly advanced. Id. at 7-8.

Plaintiff asserts that in 2013, a new class of drugs known as DAAs became available to HCV patients. Id. at 5. He argues that DAAs are oral medications with few side effects that cure HCV at a rate over 95%. Id. According to Plaintiff, in 2014, the American Association for the Study of Liver Diseases (AASLD) and the Infectious Disease Society of America (IDSA) recommended DAA treatment for all persons with chronic HCV. Id. And since 2014, DAA treatment "has been the standard of care for the treatment of HCV . . . ." Id. Plaintiff contends that despite DAAs becoming available in 2013,

Defendants failed to provide these lifesaving medications to thousands of HCV-positive prisoners, in contravention of the prevailing standard of care. Id. at 6.

Plaintiff alleges that Corizon, an out-of-state corporation registered to do business in Florida, contracted with the FDOC from in 2013 until May 2016 to provide health care services to prisoners in FDOC custody, including Plaintiff.[3] Id. at 3. Plaintiff argues that Corizon officials knew about DAAs when the medication became available in 2013 and knew DAA treatment was the medical standard of care and treatment for chronic HCV. Id. at 7. He also contends that Corizon knew that thousands of FDOC prisoners suffered from HCV, but it refused to provide DAAs or any other treatment for the virus. Id.

Plaintiff asserts that for nearly four years, Corizon knew Plaintiff had chronic HCV but refused to provide him with DAA treatment despite knowing that his condition prioritized him for such treatment. Id. at 8. According to Plaintiff, Corizon denied him HCV treatment from July 2013 until May 2016 because Corizon and the FDOC "had a policy, practice, and custom of not providing [DAAs] to patients with HCV, in part to save costs and to make larger profits." Id. at 9. He argues that as a result of Corizon and FDOC's practice, policy, and custom of refusing to treat Plaintiff with DAAs from July

---

[3] In his AC, Plaintiff alleges that Corizon's contract with the FDOC started in 2012, but in his response to Defendant Corizon's motion to dismiss, Plaintiff admits that Corizon's contract began in 2013. Doc. 51 at 5.

4

2013 to May 2016, "he sustained serious damage to his health and an increased risk of future health complication." Id.

Plaintiff maintains Defendant Centurion replaced Corizon as the FDOC's contracted health care vendor in May 2016, and that Centurion and FDOC provided health care services from May 2016 to present. Id. at 9. He asserts that starting in May 2016, Centurion knew that thousands of FDOC prisoner had untreated HCV and it also knew that it was the medical standard of care to treat chronic HCV with DAAs. Id. at 9-10. But according to Plaintiff, Centurion denied Plaintiff DAA treatment from May 2016 until October 9, 2017 pursuant to FDOC's and Centurion's cost-saving policy, practice, and custom of not providing DAAs to HCV-positive inmates. Id. at 10. Plaintiff alleges that Centurion did not provide Plaintiff with DAA treatment until after the FDOC was sued in federal court and an injunction was entered requiring FDOC to provide HCV-positive inmates care. Id. at 10-11. Plaintiff contends that because Centurion and FDOC delayed his treatment, he sustained serious damage to his health and irreparable damage to his liver. Id. at 11.

Plaintiff raises four counts for relief. See generally AC. In Counts I and II, Plaintiff alleges that Defendants Corizon and Centurion, respectively, violated his rights under the Eighth Amendment by delaying his HCV treatment. AC at 12-15. In Count III, Plaintiff alleges that the FDOC violated the ADA by discriminating against him based on his disability when it

5

withheld medical treatment while not withholding medical treatment from prisoners with other disabilities or who were not disabled. Id. at 15-19. Finally, in Count IV, Plaintiff asserts that the FDOC violated the RA when it excluded Plaintiff from receiving lifesaving HCV treatment "solely by reason of his disability." Id. at 19-20. Plaintiff alleges that as a direct and proximate cause of Defendants' policy, practice, and custom of delaying his HCV treatment, he has suffered and will continue to suffer harm. As relief, Plaintiff seeks declaratory relief, compensatory and punitive damages, as well as attorney's fees and costs. Id. at 21.

### III. Summary of Record Evidence[4]

#### a. Record of HCV Standard of Care

According to Doctor Angel Alsina's Expert Report, HCV treatment for inmates before 2014 "was limited to watchful waiting for evidence of decompensation." Doc. 68-2 at 11. Treatment with medication available at that time "was used on inmates only in rare cases because of the high severe side effect rate." Id. According to Alsina, FDA approval of DAAs began in November 2013. Id. at 11. But FDA approval did not mean that DAAs were readily

---

[4] In support of its Motion, Defendant Centurion provides Doctor Angel Alsina's Expert Report outlining the history of HCV care and Plaintiff's HCV treatment, see generally Doc. 68-2; and in support of their Motions, Defendants FDOC and Corizon provide copies of several medical records that Dr. Alsina references in his Report, see generally Docs. 69-1; 70-1. The Court summarizes all of Defendants' exhibits in concert to provide a chronological summary of the record.

available in correctional systems because of health system, clinic, and patient barriers. Id. Indeed, "DAAs were prohibitively expensive in 2014." Id. Further, before 2016, private and public insurers would not approve DAA treatment without pre-conditions, and "it was not until 2016 that the effectiveness of DAAs became clearly evident in the general population." Id. Thus, Alsina states that "[p]ushing the standard of care of Hepatitis C treatment with DAAs to 2014 would be too far back." Id. And while the AASLD and IDSA recognized that treatment of all HCV patients "was desirable, financial and institutional constraints made that impossible[] [and] no guidelines by any society, including the AASLD, ever recommended that all inmates had to be treated." Id.

Indeed, in 2015, the AASLD still recommended stratification of HCV patients – "that is each system, clinic, center, or practice had to have a system of which patients could be treated when [DAAs] became available, based on the resources that were available, liver disease severity, comorbid conditions . . . , and other manifestations outside of the liver . . . ." Id. at 13. According to Alsina, when DAAs became available, the FDOC heeded this recommendation and fashioned guidelines to select individuals most likely to benefit from HCV treatment and prevent harm to those most likely to be harmed by the treatment. Id.

On June 27, 2016, the FDOC revised its HCV guidelines to stratify HCV treatment based on severity. "In short, the more advanced cirrhotic patients or fibrotic stages were to be treated first." Id. at 9. According to the 2016 guidelines, prisoners with decompensated cirrhosis, transplant candidates or recipients, HCC patients, and those with comorbid medical conditions were grouped into the highest priority (Priority Level I). Id. Next, inmates with an APRI score greater than 2, which predicts cirrhosis, were grouped into the intermediate priority (Priority Level II). Id. The APRI calculation (aspartate aminotransferase to platelet ratio) estimates the severity of liver disease in inmates with HCV. The FDOC later revised the guidelines three times in 2017. Id. at 10. Of import, in October 2017, the FDOC introduced the Fibrosis-4 (FIB-4) calculation to the guidelines as another estimate for the severity of liver disease, and noted that a APRI greater than 2 equaled a diagnosis of F4 or cirrhosis. The revised guidelines also mentioned that "[r]esource challenged systems may use a combination of proprietary indices and ultrasound" for estimating severity of liver disease. Id. On December 8, 2017, the FDOC again revised its guidelines to change the prioritization criteria for the most urgent group (Priority Level I) to include a combination of stage 4 fibrosis/cirrhosis (previously Level II) and decompensated patients. Id.

### b. Record of Plaintiff's Medical Care

Plaintiff was diagnosed with HCV on October 2, 2008, and was immediately referred to the "GI Clinic." Doc. 68-1 at 6; Doc. 68-2 at 5. Medical continued to monitor Plaintiff for diabetes, hypertension, and HCV in 2009. Doc. 68-2 at 5-6. And Alsina's Report shows that the Chronic Illness Clinic monitored Plaintiff's HCV and liver function from 2010 to 2021. Doc. 68-2 at 8. In August 2010, Plaintiff's HCV RNA (viral load) measured 1.1 million IU/mL. Id. at 6. In March 2012, Plaintiff was diagnosed with genotype 1 Hepatitis C. Doc. 68-2 at 6. And in April 2013, Plaintiff was counseled on the prognosis of his HCV. Doc. 68-2 at 6.

Corizon began providing medical services to certain FDOC inmates in September 2013. Doc. 71 at 2. On September 9, 2014, medical evaluated Plaintiff in the Chronic Illness Clinic and recorded that Plaintiff's HCV was "controlled" and "asymptomatic." Doc. 70-1 at 1. Medical ordered Plaintiff to undergo blood work and follow-up in the outpatient department in three months and return to clinic for routine evaluation on March 3, 2015. Id. Plaintiff returned to the Chronic Illness Clinic on March 3, 2015, and medical documented that his HCV was still "asymptomatic." Id. at 2. Plaintiff's discussed medical plan was diet and exercise, follow-up with the outpatient department in three weeks, and return to clinic in four months. Id. According to Alsina's Report, Plaintiff's medical record from February 2016 shows his

FIB-4 test was 2.26, which suggested that Plaintiff did not have advanced fibrosis or cirrhosis. Doc. 68-2 at 6.

In April 2016, Defendant Centurion took over medical care at Plaintiff's correctional facility. Id. at 6 n.2. After Centurion's takeover, Plaintiff's APRI scores in July 2016 and September 2016 were 0.625 and 0.6, respectively, neither of which suggested advanced fibrosis. Id. at 6. Medical evaluated Plaintiff at the Chronic Illness Clinic on September 6, 2016, during which Plaintiff advised he "fe[lt] good," and medical documented that Plaintiff's HCV was "well controlled," recorded his APRI score as 0.6, and planned for Plaintiff to return to clinic in six months. Doc. 70-1 at 3. On October 26, 2016, medical placed Plaintiff on the list to be reviewed by a special committee to determine his HCV treatment schedule. Doc. 68-2 at 6.

In February 2017, Plaintiff's APRI score was 0.305 and his HCV remained asymptomatic. Id. On March 10, 2017, medical evaluated Plaintiff in the Chronic Illness Clinic and again documented that Plaintiff's HCV remained asymptomatic and his APRI score was 0.305. Doc. 70-1 at 4. Medical then scheduled Plaintiff to return to the Chronic Illness Clinic in 180 days. Id. On November 27, 2016, a "hepatitis screen indicat[ed] that [Plaintiff] had NO HIV, IS NOT ON HEMODYALYSIS, HAS NO ENCEPHALOPATHY, NO ASCITES, AND HAS HAD NO PREVIOUS HCV TREATMENT FAILURES, thus indicating a low priority for treatment" at that time. Doc. 68-2 at 6. That

same month Plaintiff had an APRI of 0.24 and a FIB-4 of 1.3, neither of which indicated advanced fibrosis. Id. at 7.

On November 28, 2017, Plaintiff underwent a FibroTest yielding a score of 0.78, which suggested Plaintiff had "severe fibrosis." Doc. 70-1 at 6. According to Dr. Alsina, that finding did not correlate with any previous non-invasive fibrosis test that Plaintiff underwent, nor did it correlate with any future test that Plaintiff underwent afterward. Id. at 7. Indeed, On December 26, 2017, Plaintiff underwent an ultrasound of his liver, and no abnormalities were identified. Doc. 70-1 at 9.

On February 26, 2018, Plaintiff's APRI score was 0.5 and his FIB-4 score was 1.61, neither revealed F4 fibrosis or cirrhosis. Doc. 68-2 at 7. On March 14, 2018, medical counseled Plaintiff on DAA treatment with Epclusa, including side effects, drug interactions, and the 84-day treatment regimen. Id. According to Dr. Alsina's review of Plaintiff's medical records, after medical conducted an ultrasound of Plaintiff's liver and confirmed no heterogeneity or diffuse echogenicity, it ordered Plaintiff start treatment with Epclusa and check Plaintiff's HCV viral load twelve weeks after completion. Id.; see also Doc. 70-1 at 10. Plaintiff began Epclusa treatment on March 20, 2018, Doc. 68-2 at 7, and at an April 11, 2018, follow-up with medical, Plaintiff advised, "I'm fine. I haven't had any problems," Doc. 70-1 at 11.

Plaintiff completed treatment on June 11, 2018. Doc. 68-2 at 7. Medical conducted an ultrasound of Plaintiff's liver on August 7, 2018, which showed his liver was "mildly heterogeneous," but otherwise revealed "no significant findings." Doc. 69-1 at 22. On September 4, 2018, Plaintiff's HCV RNA (viral load) was < 15 IU/mL, and according to Dr. Alsina, Plaintiff was considered "cured of Hepatitis C." Doc. 68-2 at 7; see also Doc. 69-1 at 23. About six days later, medical evaluated Plaintiff in the Chronic Illness Clinic, during which Plaintiff had no complaints and medical documented that his HCV was nondetectable post treatment. Doc. 70-1 at 14. On November 1, 2018, Plaintiff advised medical that he was "doing great." Doc. 68-2 at 7. A month later, on December 7, 2018, Plaintiff submitted his first grievance complaining that Corizon and Centurion "deliberately delayed [his] medical treatment for HCV [s]oley because they did not want to pay for DAA[] treatment." Doc. 51 at 4.

An ultrasound taken on June 4, 2019, showed Plaintiff's liver had normal echotexture. Doc. 69-1 at 24. On August 13, 2019, all Plaintiff's liver function tests were considered normal. Doc. 68-2 at 7. On December 12, 2019, an ultrasound of Plaintiff's liver showed an appearance of liver contour nodularity and suspected liver cirrhosis. Doc. 70-1 at 16. But a follow-up FibroTest taken on February 1, 2021, showed Plaintiff had a FibroTest score of 0.5, which suggested only moderate fibrosis, with no inflammatory activity, and no evidence of advanced fibrosis or cirrhosis. Doc. 69-1 at 29. Further, according

12

to Dr. Alsina's Report, medical conducted a follow-up evaluation of Plaintiff in the Chronic Illness Clinic on February 11, 2021, and noted Plaintiff's F2 fibrosis was down from F4, his APRI score was 0.232, and his FIB-4 score was 1.33, none of which showed advanced fibrosis. Doc. 68-2 at 7.

### c. Dr. Angel Alsina's Expert Opinions

After reviewing Plaintiff's medical records from 2006 to 2021, relevant FDOC guidelines on HCV treatment, Plaintiff's pleadings, and relevant case law and medical publications, Dr. Alsina's expert opinions in relevant part are as follows:

> Mr. Brown was diagnosed with HCV in October 2008 by antibody testing. A positive HCV RNA in August 2010 confirmed the diagnosis.
>
> From 2007 to February of 2021, Mr. Brown had normal synthetic function (clotting, bilirubin, and albumin). He also has no conclusive signs of cirrhosis on imaging, noninvasive testing, physical exam, CT scan, MRI, MRI elastography, or liver biopsy (none of these ever done). In fact, the evidence points to the contrary, of absence of F4 fibrosis or advanced fibrosis or cirrhosis. Mr. Brown has no signs of portal hypertension. Mr. Brown has no signs of decompensated cirrhosis as alleged in the Complaint. He has no signs of cirrhosis at all.
>
> Mr. Brown did not have medical tests on September 23, 2011, November 27, 2012, September 9, 2013, August 22, 2014, February 18, 2015, May 26, 2016, July 29, 2016, that indicated that he had decompensated cirrhosis, as alleged in the Complaint.

Not in one instance, before or after the treatment of hepatitis C, before or after Centurion cared for Mr. Brown, did Mr. Brown have alterations in his liver synthetic function of bilirubin, protein production (albumin), or clotting. Therefore, any allegations that he has sustained serious liver damage and that he is at increased risk of future health complications are unfounded.

CENTURION OF FLORIDA, LLC TREATED THE HEPATITIS C VIRUS FROM MARCH 20 TO JUNE 18, 2018 RESULTING IN NON-DETECTIBLE RNA ("CURE" OF THE VIRUS). By September of 2020, he is cured of HCV and his liver synthetic function and platelets remain normal.

Other than one single biochemical Fibrotest (composed of biochemical markers), there is no clinical parameter, no imaging study, or high quality elastography that has revealed or was ever obtained to show that Mr. Brown has cirrhosis. On the contrary, the tests obtained showed the opposite, the absence of cirrhosis. Concluding that his liver is at risk of complications of cirrhosis is also speculative and inaccurate.

His liver function remains normal after the HCV treatment.

Mr. Brown did not develop any degree of liver fibrosis because of actions or inactions of Centurion or its physicians.

There are claims in the Complaint that were never found in the medical records, including: 1) that Mr. Brown has irreparable liver damage. 2) that Mr. Brown experiences fatigue, mild depression, joint pain, brain fog, swelling, and pain near the liver, irritable bowel movement, and sleep disorder. 3) that Mr. Brown has cirrhosis, which was worsened, due to delay of the treatment. 4) that Mr. Brown's liver

14

condition is getting worse. These claims may be from other inmates, but they are not facts or symptoms that Mr. Brown had or now has. To the contrary, in 2019, after HCV treatment, Mr. Brown felt great and did not voice any complaints. He was also without symptoms from HCV during all the years prior to his HCV treatment.

Fibrosis scores and tests: Mr. Brown was followed with liver function tests and other parameters to rule out cirrhosis (platelets, liver ultrasound). On February 26[, 2021], the APRI score is 0.5 and Fib-4 score is 1.61, none indicating F4 fibrosis or cirrhosis. I calculated these tests to confirm this.

. . . .

Mr. Brown had normal synthetic function before and after the HCV treatment. This is an important and excellent prognostic factor for him. He has no structural changes or a stiff liver, or indications that he will acquire complications from such. Allegations that he is at risk for advanced liver failure or death are unfounded.

He has no evidence of hepatocellular carcinoma or liver cancer (HCC). His HCC risk is dependent of the degree of fibrosis, which is not advanced at this point. His HCC risk is not the result of the timing of HCV treatment, or actions or inactions of Centurion or its physicians. One more important point on his subsequent risk of liver cancer is that Mr. Brown is diabetic and obese. This confers him an additional independent risk of liver cancer.

Nowhere in the records that were available to me is there an indication that the physicians intended not to treat him.

There is no indication from the medical records that I reviewed that any delay in his HCV treatment or cure caused him physical pain, mental discomfort, alterations in his daily living, shortened his lifespan, or caused severe emotional pain and suffering, as claimed.

CENTURION OF FLORIDA, LLC MET THE APPROPRIATE MEDICAL STANDARDS OF CARE IN THE TREATMENT OF MR. BROWN'S HEPATITIS C VIRUS.

Treatment of inmates with DAAs was done according to guidelines that were being followed. DAAs were not readily available in 2013, 2014, 2015, and 2016, as claimed, for everyone. It took several years for these drugs to be readily available, not just to be prescribed. In 2016, of 221,090 patients that were HCV RNA positive in this country, only 17% saw a specialist. Nationwide, only 8% of HCV positive baby boomers were ever treated with DAA's

Any alleged delay in treatment with DAAs did not cause or contribute to Mr. Brown's fibrosis. No Hepatitis-C or liver related injuries were suffered by Mr. Brown and cannot be attributed to any action or inaction of Centurion or any of its providers. It is undisputed that Centurion was responsible for administering the DAA therapy that cured Mr. Brown of his HCV infection and had a beneficial impact on his liver function. His liver fibrosis is not advanced at this point.

I FIND NO EVIDENCE THAT CENTURION OF FLORIDA, LLC, ACTED WITH INDIFFERENCE TO THE MEDICAL NEEDS RELATED TO MR. BROWN'S CHRONIC MEDICAL CONDITIONS, MORE SPECIFICALLY AS IT REGARDS THE DIAGNOSIS AND TREATMENT OF HEPATITIS C.

DAAs were not available in late 2013. DAAs were not readily available to all people in late 2016 either (data for U.S. presented). The 2014 Guidelines that are quoted by the Plaintiff recommend that patients be treated and stratified according to severity (AASLD/IDSA HCV Guidance Panel, 2015). It is not a mandate to treat all patients. Very few patients in the U.S. were treated in 2014-16. That was the standard of care, not just for inmates, but for everyone else. Inmates did not have preferential treatment over everyone else, or vice versa. Mr. Brown was not in the highest priority of treatment, per Society Guidelines.

NOTHING THAT CENTURION DID OR DID NOT DO, CAUSED OR CONTRIBUTED TO THIS PATIENT'S DEGREE OF LIVER FIBROSIS OR ANY INJURY THAT COULD SUBSEQUENTLY DEVELOP.

It is my opinion that Centurion provided Mr. Brown with appropriate and reasonable medical care that met the standards of care and complied with the guidelines established by the FDOC, as well as the AASLD/IDSA, for the treatment of HCV infection and cirrhosis of the liver, and that under the care of Centurion and its providers, Mr. Brown's HCV was cured. There is nothing in the records which leads me to believe that Mr. Brown's care was appreciably different from what would have been expected in the broader community at that time.

There is no evidence in the records that I reviewed that Mr. Brown sustained any disability, injury, or other adverse consequence as a result of the manner in which he was treated by Centurion for his Hepatitis C infection. I find no evidence that Centurion of Florida acted indifferently to the medical needs related to Mr. Brown's diagnosis and treatment of Hepatitis C and liver cirrhosis, or that its actions caused or contributed to any injuries to him. The

medical records do not support the notion that the treatment was intentionally withheld.

Doc. 68-2 at 16-21 (paragraph enumeration omitted).

## IV. Standard of Review for Summary Judgment

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of proving to the court, by reference to the record, that there are no genuine issues of

material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), in order to discharge this initial responsibility." Gonzalez v. Lee Cnty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may show "that there is an absence of evidence to support the nonmoving party's case." Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## V. Defendants Corizon and Centurion's Motions

### *a. Eighth Amendment*

"To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct." Oliver v. Fuhrman, 739 F. App'x 968, 969 (11th Cir. 2018) (citing Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)). The Eleventh Circuit has explained:

> Under the objective component, a prisoner must allege a condition that is sufficiently serious to violate the Eighth Amendment. Id. The challenged condition must be extreme and must pose an unreasonable risk of serious damage to the prisoner's future health or safety. Id. The Eighth Amendment guarantees that prisoners are provided with a minimal civilized level of life's basic necessities. Id.

> Under the subjective component, a prisoner must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference. Id. This means the prisoner must show that the prison officials: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) displayed conduct that is more than mere negligence. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).

Id. at 969-70. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986).

As it relates to medical care, "[t]he Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). The Eleventh Circuit has explained that

> To prevail on a deliberate indifference claim, [a plaintiff] must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir.2009). To establish deliberate indifference, [a plaintiff] must prove "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir.2010) (alteration in original). The defendants must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and then actually draw that inference. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (quotation omitted).

Easley v. Dep't of Corr., 590 F. App'x 860, 868 (11th Cir. 2014). "For medical treatment to rise to the level of a constitutional violation, the care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Nimmons v. Aviles, 409 F. App'x 295, 297 (11th Cir. 2011) (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir.1991)); see also Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Grossly incompetent or inadequate care can constitute deliberate

indifference, as can a doctor's decision to take an easier and less efficacious course of treatment" or fail to respond to a known medical problem).

Notably, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). As such, a complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks and citation omitted). Moreover, the Eleventh Circuit has stated that "[n]othing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." Bismark v. Fisher, 213 F. App'x 892, 897 (11th Cir. 2007) (quoting Waldrop, 871 F.2d at 1033). Similarly, "the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams v. Poag, 61 F.3d 1537, 1545

(11th Cir. 1995) (citation omitted). Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must prove harm caused by the indifference. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

Additionally, to prevail on a claim against Corizon and Centurion as private entities serving a traditional public function, Plaintiff must meet the test articulated in Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 690-94 (1978). Accordingly, Plaintiff must show that an official policy or custom caused the constitutional violation. Id. at 694. To make this showing, he must demonstrate that (1) he was deprived of a constitutional right; (2) Corizon and Centurion had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1110-11 (9th Cir. 2001). Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. Monell, 436 U.S. at 691 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and

consistency that the conduct has become a traditional method of carrying out policy." <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996).

### b. Serious Medical Need

Neither Defendant Corizon nor Defendant Centurion dispute that Plaintiff established that his HCV constituted a serious medical need. Thus, the Court considers only whether Defendants' actions amounted to deliberate indifference.

### c. Deliberate Indifference

#### 1. <u>Corizon</u>

Defendant Corizon argues it is entitled to summary judgment because Plaintiff cannot establish the first element of the <u>Monell</u> analysis as the record does not show that Plaintiff was deprived of a constitutional right. To that end, Corizon asserts it did not act deliberately indifferent to Plaintiff's serious medical need because it consistently monitored Plaintiff's condition and facilitated Plaintiff's routine consultations with a gastroenterologist. Corizon Motion at 15. Corizon also asserts there is no record evidence that any unconstitutional policy caused Plaintiff to suffer additional injury beyond that of the disease. <u>Id.</u> According to Corizon, while Plaintiff asserts that delay in treatment caused liver damage, there is no such evidence of liver damage, rather the record shows Plaintiff was cured and suffered no other injury. <u>Id.</u>

In response, Plaintiff alleges that Defendants are aware of Plaintiff's heavy liver scarring and risk of liver cancer. Doc. 72 at 3. He also contends that he is "not required to introduce verifying medical evidence concerning the effect of the delay in treatment, because the obviousness of [his] serious medical need is itself sufficient to satisfy the objective component of the deliberate indifference test." Id. at 3. In its Reply, Corizon argues that Plaintiff has failed to meet his burden as the Response "includes no citation to the record indicating a dispute of material fact . . ." and Plaintiff instead relies only on his conclusory statements. Corizon Reply at 2.

Although the FDA first approved DAAs in late 2013, the record shows that DAAs were not readily available in 2013, 2014, 2015, and 2016. Doc. 68-2 at 19. Indeed, HCV treatment before 2014 was limited to watchful waiting for evidence of decompensation. And the record shows that Corizon routinely monitored Plaintiff's HCV symptoms between the commencement of its contract with FDOC in September 2013 and the termination of its contract in May 2016. During Corizon's time, officials monitored Hepatitis C inmates by conducting liver function tests and regular medical evaluations in the Chronic Illness Clinic. The record shows that Plaintiff was followed in the Chronic Illness Clinic for his Hepatitis C from 2010 to 2021. Doc. 68-2 at 8. Chronic Illness Clinic records from 2014, 2015, and 2016 show that Corizon checked the progression of Plaintiff's HCV and during each of those assessments,

Plaintiff's HCV was documented as "controlled" and "asymptomatic." Doc. 70-1 at 1-3. The record also shows that Plaintiff underwent liver function tests in 2013, 2014, 2015, and 2016, and these tests revealed he "had normal synthetic function before and after the HCV treatment[, which] is an important and excellent prognostic factor for him . . . [and] allegations that he is at risk for advanced liver failure or death are unfounded." Doc. 68-2 at 8. There is also no evidence that medical tests completed between 2011 and 2016 revealed Plaintiff had decompensated cirrhosis. See id. at 17.

While Plaintiff alleges that he filed several grievances complaining about his HCV-related symptoms and requesting treatment, Plaintiff's first grievance related to any alleged delay was filed in December 2018. Indeed, there is no evidence that he made any complaint about his HCV symptoms or treatment while he was under Corizon's care. On this record, the facts do not show a deliberate disregard for Plaintiff's HCV or that Corizon's response to Plaintiff's serious medical need was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Construing the facts in Plaintiff's favor, he was cured of HCV in September 2018 and his most recent APRI score is 0.232 and FIB-4 score is 1.33, neither of which indicates advanced fibrosis. Doc. 68-2 at 7. Thus, any delay in treatment did not cause Plaintiff to suffer the HCV or liver-related injuries he alleges in his Amended Complaint, and Plaintiff has not submitted

any evidence suggesting that he suffered those alleged injuries. The record does not support Plaintiff's claim that Corizon's treatment amounted to an Eighth Amendment violation, and summary judgment is due to be granted to Defendant Corizon.

## 2. Defendant Centurion

Defendant Centurion argues that even if Plaintiff can show a Centurion custom resulted in a delay of HCV treatment, his claim still fails because there is no evidence that Centurion's medical providers were deliberately indifferent to his chronic HCV.[5] Centurion Motion at 15. Centurion asserts that it provided continuous care and monitoring to Plaintiff beginning in May 2016 and it continued to monitor Plaintiff's condition until he was approved for DAA treatment in March 2018 in accordance with the timeframe identified in Hoffer.[6] Id. According to Centurion, because of its adequate medical care, Plaintiff was cured of his HCV. Id. at 17. Centurion also argues that Plaintiff

---

[5] Centurion also argues that it was not the "final authority" on DAA treatment or the "moving force" behind any policy or practice to delay DAA treatment but the FDOC was responsible for such policy. Centurion Motion at 2. Alternatively, Centurion argues that even if Plaintiff shows that Centurion had a policy to delay treatment, Plaintiff has still failed to show that Centurion acted deliberately indifferent. Id. at 15. Because the Court finds Centurion has not acted deliberately indifferent, it need not decide whether Centurion had a policy to delay treatment.

[6] The Court discusses the Hoffer litigation when addressing Defendant FDOC's Motion for Summary Judgment.

cannot show that he suffered any "increased physical injury" because of any alleged delay in DAA treatment from May 2016 to March 2018. Id.

In response, Plaintiff alleges that Defendants are aware of Plaintiff's heavy liver scarring and risk of liver cancer. Doc. 72 at 3. He also contends that he is "not required to introduce verifying medical evidence concerning the effect of the delay in treatment, because the obviousness of [his] serious medical need is itself sufficient to satisfy the objective component of the deliberate indifference test." Id. at 3.

Here, the evidence shows that Plaintiff received constitutionally adequate treatment for his HCV while under the care of Centurion. The record shows that starting in May 2016, Centurion regularly monitored Plaintiff's liver function and the progression of his HCV. Doc. 68-2 at 8. Centurion also regularly evaluated Plaintiff in the Chronic Illness Clinic, where it maintained a record of Plaintiff's APRI score and his symptoms. Doc. 70-1 at 4. In July and September 2016, Centurion recorded Plaintiff's APRI scores as 0.625 and 0.6, respectively, neither of which suggested Plaintiff was suffering from advanced fibrosis when he came into Centurion's care. Id. at 6. Further, per the FDOC's June 2016 HCV guidelines, neither of those APRI scores placed Plaintiff in the Priority Level I group for urgent consideration of DAA treatment. Id. at 9. Nevertheless, in October 2016, Plaintiff was logged for a special committee review on his HCV and determination of a treatment schedule. Id. at 6.

In February 2017, Centurion recorded Plaintiff's APRI score as 0.305 and documented that he remained asymptomatic. Id. at 6. Centurion recorded that in November 2017, Plaintiff's APRI score was 0.24 and his FIB-4 score was 1.3, neither of which showed advanced fibrosis. But Centurion documented that on November 29, 2017, for the first and only time, a FibroTest indicted a score of 0.78, which placed Plaintiff in the "severe fibrosis" category. Centurion immediately ordered that Plaintiff undergo a liver ultrasound, which confirmed his liver appeared normal and further supporting that the November 29, 2017, FibroTest score did not correlate with any prior or subsequent test of liver fibrosis. Indeed, in February 2018, Centurion again documented Plaintiff's APRI score as 0.5 and his Fib-4 score as 1.61, neither of which reflected advanced fibrosis or cirrhosis. Doc. 68-2 at 7.

Centurion approved Plaintiff for an 84-day round of DAA treatment in March 2018, and documented Plaintiff's progression and symptoms throughout the treatment. Id. Plaintiff tolerated the treatment well and in September 2018, Plaintiff's HCV RNA (viral load) was < 15 IU/mL, which revealed Plaintiff was cured of HCV. Id. In November 2018, Plaintiff advised medical that he was "doing great." Again, while Plaintiff alleges that he filed several grievances complaining about his HCV-related symptoms and requesting treatment, Plaintiff's first grievance related to any alleged delay was filed in December 2018, after he was cured. Indeed, there is no evidence

that Plaintiff made any complaint about his HCV symptoms or delay in treatment before Centurion provided him with DAAs and cured his HCV.

These facts do not show a deliberate disregard for Plaintiff's HCV or that Centurion's response to Plaintiff's medical needs was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." The record indicates that Plaintiff has suffered no injury because of the alleged delay in treatment. Construing the facts in Plaintiff's favor, his most recent tests show an APRI score of 0.232, a FIB-4 score of 1.33, and a FibroTest score of F2, none indicate advanced fibrosis. Id. at 7. Thus, any delay in treatment did not cause Plaintiff to suffer the HCV or liver-related injuries he alleges in his Amended Complaint, and Plaintiff has provided no evidence to support his claim otherwise. Even though Plaintiff has already received DAA treatment, the record shows that Centurion continues to monitor Plaintiff's symptoms and regularly tests him for fibrosis. The record does not support Plaintiff's claim that Centurion's treatment amounted to an Eighth Amendment violation, and summary judgment is due to be granted to Defendant Centurion.

## VI. Defendant FDOC's Motion

### *a. ADA and RA*

In Counts III and IV, Plaintiff sues Defendant FDOC under the ADA and RA, respectively. Plaintiff alleges that he is a qualified individual with a

disability, "because HCV is a physiological disorder that affects one or more body systems . . . ." AC at 14. He asserts that "[b]y withholding medical treatment for those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FD[O]C excluded Plaintiff from participation in, and denied him the benefits of" FDOC services, programs, and activities because of his disability. Id. at 17-18. According to Plaintiff, FDOC knew about the violations but failed to correct them, exhibiting deliberate indifference to Plaintiff's rights. Id. at 18, 20.

Defendant FDOC moves for summary judgment, arguing that Plaintiff cannot show that it acted deliberately indifferent to Plaintiff's HCV as to articulate an ADA or RA claim against it. FDOC Motion at 7. FDOC asserts that Plaintiff's allegations that he has "severe cirrhosis" and "permanent liver damage" are merely conclusory statements with no record support. Id. at 10-11. Rather, according to FDOC, Plaintiff's medical records do not show any evidence of "hepatocellular carcinoma or liver cancer," and there is no evidence of "ascites or esophageal varices." Id. at 15. Further, FDOC argues that the record shows Plaintiff's HCV was and is regularly monitored and any alleged delay in treatment did not cause or contribute to Plaintiff's fibrosis as Plaintiff did not suffer any HCV or liver-related injuries. Id. In support of its argument that it provided adequate medical care to Plaintiff, FDOC relies on the

Eleventh Circuit's opinion in <u>Hoffer v. Sec'y, Fla. Dep't of Corr.</u>, 973 F.3d 1263, 1279 (11th Cir. 2020). FDOC Motion at 18.

To prevail on his ADA and RA claims for compensatory damages, Plaintiff must establish that FDOC acted with "discriminatory intent" in violating Plaintiff's statutory rights. <u>McCullum v. Orlando Reg'l Healthcare Sys., Inc.</u>, 768 F.3d 1135, 1146-47 (11th Cir. 2014). Plaintiff "may prove discriminatory intent by showing that [FDOC] was deliberately indifferent to his statutory rights."[7] <u>See id.</u> at 1147. "That is an exacting standard which requires more than gross negligence." <u>Id.</u> (internal citation and quotation marks omitted). To satisfy this standard, Plaintiff must "show that [FDOC] knew that harm to a federally protected right was substantially likely and failed to act on that likelihood." <u>Id.</u> (quotation marks and citation omitted). The Eleventh Circuit recognizes several examples of conduct that meet this standard, including "(1) knowledge of a serious medical need and a failure or refusal to provide care; [and] (2) delaying treatment for non-medical reasons[.]" <u>Baez v. Rogers</u>, 522 F. App'x 819, 822 (11th Cir. 2013).

---

[7] The "deliberate indifference" standard is the same in both the Eighth Amendment and ADA/RA contexts. Whether the deliberate indifference is to a plaintiff's rights under the Constitution or a federal statute, "a plaintiff must show that the defendant 'knew harm to a federally protected right was substantially likely' and 'failed to act on that likelihood.'" <u>McCullum</u>, 768 F.3d at 1147 (citation omitted); <u>see also</u> <u>Martin v. Halifax Healthcare Sys., Inc.</u>, 621 F. App'x 594, 604 (11th Cir. 2015) (relying on Eighth Amendment jurisprudence to articulate deliberate indifference standard in ADA/RA context).

In the <u>Hoffer</u> litigation, the Northern District of Florida certified a class consisting of "all current and future prisoners in the custody of the Florida Department of Corrections who have been diagnosed, or will be diagnosed, with" HCV. <u>Hoffer v. Jones</u>, 323 F.R.D. 694, 700 (N.D. Fla. 2017). The plaintiffs sued the Secretary of the FDOC in her official capacity, alleging the denial of DAAs under a cost-savings policy violated, <u>inter alia</u>, the Eighth Amendment. <u>Id.</u> at 696. Following an evidentiary hearing, the court granted the plaintiffs' request for a preliminary injunction and issued an opinion. <u>See Hoffer</u>, 290 F. Supp. 3d at 1306. After resolving issues raised on summary judgment, the court entered a permanent injunction mandating that the FDOC provide DAA treatment for all HCV-positive inmates. <u>See Hoffer v. Inch</u>, 382 F. Supp. 3d 1288 (N.D. Fla. 2019). The Secretary appealed the court's ruling on summary judgment, and on August 31, 2020, the Eleventh Circuit vacated the district court's permanent injunction; reversed the court's finding that the Secretary's treatment of F0-and F1-level HCV-positive inmates violated the Eighth Amendment, "with instruction to award summary judgment to the Secretary on that issue"; and remanded the rest of the district court's order, "so that it can make the findings required by the PLRA." <u>Hoffer</u>, 973 F.3d at 1279. The Eleventh Circuit reasoned that the Eighth Amendment does not prohibit prison officials from considering cost in determining what type of medical treatment to provide and since the Secretary had implemented a treatment

plan that provides "minimally adequate care," the plaintiffs cannot say that her conduct in treating HCV-positive inmates amounted to deliberate indifference. Id. at 1277-78.

Defendant FDOC now relies on the Eleventh Circuit's opinion to support its claim that it has not acted deliberately indifferent, and the Court finds the Eleventh Circuit's reasoning binding. FDOC does not dispute that Plaintiff's HCV amounted to a serious medical need or that it knew of that serious medical need. Rather, it argues that it, through Corizon and Centurion, provided adequate medical care to Plaintiff and its decisions about Plaintiff's HCV care were not made with discriminatory intent but were based on a well-thought-out prioritization schedule that considered the severity of Plaintiff's condition and the resources available to the FDOC. The Court agrees.

The record shows that starting in 2008, when Plaintiff was diagnosed with HCV, until present day, FDOC has routinely monitored Plaintiff's liver function. The record also shows that DAAs did not become the standard of care until 2016, and in June 2016, the FDOC revised its HCV guidelines to outline a treatment and priority plan for its inmates with HCV. FDOC then revised those guidelines in 2017 to account for more prioritization criteria. Doc. 68-2 at 9-10. As explained, FDOC, Corizon, and Centurion continuously supervised Plaintiff based on the relevant prioritization criteria (APRI score and the FIB-4 score), regularly evaluated Plaintiff in the Chronic Illness Clinic, and

conducted follow-up tests and ultrasounds when warranted. Per its guidelines, Plaintiff was eventually treated with DAAs and cured of his HCV in 2018. Plaintiff has presented no evidence that any FDOC guideline or delay in Plaintiff's treatment stemmed from intentional discrimination based on Plaintiff's HCV diagnosis.

Also, as explained, the record shows the delay in treatment did not cause Plaintiff to suffer any liver-related injury. Plaintiff was cured of his HCV and his most recent tests show no advanced fibrosis or cirrhosis. Indeed, all of Plaintiff's liver function tests are normal and FDOC continues to monitor Plaintiff to confirm that his test results remain stable. Thus, because FDOC has followed a treatment plan that provides "minimally adequate care," the Court cannot say that its conduct in treating Plaintiff's HCV and ultimately curing him of the virus, was so reckless as to constitute deliberate indifference. Defendant FDOC is entitled to summary judgment on Plaintiff's ADA and RA claims.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.    Defendant Centurion's Motion for Summary Judgment (Doc. 68) is **GRANTED**.

2.    Defendant FDOC's Motion for Summary Judgment (Doc. 69) is **GRANTED**.

3.    Defendant Corizon's Motion for Summary Judgment (Doc. 71) is **GRANTED**.

4.    The Clerk is **DIRECTED** to enter judgment for Defendants and against Plaintiff and **CLOSE** the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 3rd day of August, 2022.

_____
BRIAN J. DAVIS
United States District Judge

Jax-7

C:    Perry Brown, #044515
      Counsel of record